**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 1947** |
| | ) | |
| **TOBY JONES,** | ) | |
| | ) | |
| **Movant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A grand jury indicted Toby Jones on twelve counts based on his involvement in a drug-trafficking conspiracy, a drugs-for-guns transaction with an undercover federal agent, and retaliatory conduct directed to a confidential informant who arranged the deal. Jones pled guilty to seven counts and was convicted in a bench trial on the other five. The Seventh Circuit affirmed his convictions, and in February 2018, the Supreme Court denied his petition for certiorari. Jones has moved under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. The Court denies his motion for the reasons stated below.

### Factual background

The following facts established during Toby Jones's bench trial (before another judge of this court) are relevant to the claims in his motion under 28 U.S.C. § 2255. The criminal case was based on Jones's involvement in a drug trafficking conspiracy, a deal to exchange crack cocaine for guns from an undercover federal agent, and a conspiracy

to retaliate against the confidential informant (CI) who arranged the drugs-for-guns deal with the agent.  In September 2015, a grand jury returned a fifteen-count indictment based on these events, and Jones was charged in twelve of the counts.  The grand jury also charged Jones's brother, Kelsey Jones.  To prevent confusion, the Court will refer to Kelsey Jones by his first name.

The CI had introduced Jones to Agent Christopher Labno from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), who was working in an undercover capacity.  Between December 2013 and March 2014, Jones, the CI, and Labno met several times and discussed the possibility of Jones purchasing guns from Labno in exchange for crack cocaine.  On March 26, 2014, after Labno and Jones had negotiated a deal, Jones asked Wesley Fields, a man who worked for him, to come to Kelsey's apartment to pick up crack cocaine and cash to purchase the guns.  Jones instructed Fields to meet Labno to execute the deal and to return directly to Jones after acquiring the guns.

Fields met Labno and the CI, and after Fields offered the drugs and cash in exchange for the guns, he was arrested.  After the arrest, the CI contacted Jones, asking about his payment for arranging the gun purchase.  Jones responded that Fields had not yet returned with the guns, and he asked the CI when he had last seen Fields.

The CI then returned to his apartment.  On his drive home, Jones called him, sounding agitated, and asked the CI repeatedly about his location and that of Fields. The CI informed Jones that he was returning to his apartment and that he did not know Fields's location.  Over the next few hours, Jones repeatedly called the CI and Fields.

On March 27, 2014, Kensha Barlow, who lived one floor below the CI in the

2

same apartment complex in Oak Park, was shot in the leg through the front door of his unit. Prior to the shooting, Barlow heard a knock on the door, and when he asked who was there, he heard a male voice respond, "It's me . . . You know who it is, open the fucking door." *United States v. Jones*, 872 F.3d 483, 487 (7th Cir. 2017). Barlow briefly caught a glimpse of two men through the peephole of the door, and he did not recognize them.

On March 30, 2014, Kelsey contacted another resident of the CI's apartment building, Marty Smith, and asked him to come to Kelsey's apartment. When Smith arrived, Jones and Kelsey were both there, and Kelsey questioned Smith about the CI's whereabouts.

On April 2, 2014, the CI spotted Kelsey at his apartment building. That evening, Kelsey called Smith to ask whether there were any cameras in the parking lot of the building. A little over an hour after that call, the CI drove up to his apartment building, and when he arrived, Kelsey shot him four times. The last shot went through the CI's shoulder. Afterwards, Kelsey was picked up in a vehicle and fled the scene.

On April 5, 2014, Kelsey was arrested. Kelsey admitted to the arresting agents that he helped Jones package heroin and crack cocaine for sale, took drug orders, and helped Jones deliver those orders. Jones was arrested on April 20, 2014.

### Procedural history

In September 2015, a grand jury returned a fifteen-count indictment against Jones, Kelsey, and Kelsey's getaway driver from the April 2 shooting and charged Jones in twelve of those counts.

3

A.    **Motion to suppress Barlow's identification of Jones**

Prior to trial, Jones moved to suppress Barlow's identification of Jones as the man who shot him on March 27, 2014.  He argued that the composition of the lineup and procedures used to present it to Barlow were suggestive and thus violated his due process rights.  *See Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012).  The trial judge held a suppression hearing on Barlow's identification of Jones, made the following factual findings, and denied Jones's motion.

On March 27, 2014, the day Barlow was shot, Oak Park detectives, including Detective Robert Taylor, interviewed Barlow, and he described the shooter as a black male with a dark complexion.  The next day, March 28, 2014, Taylor interviewed Barlow again, and this time Barlow reported that his shooter was light-skinned.  Barlow added that he did not want to identify anyone, go to court, or testify about the shooting.

After the shooting of the CI on April 2, 2014, Taylor contacted Barlow to see if he would come to the station to review photo lineups.  Barlow went to the Oak Park police station, and Taylor presented him with a color photo lineup that included a photo of Jones.  Barlow did not identify anyone in the lineup.  Taylor testified that Barlow's gaze paused on Jones's photo.  Barlow later testified that he did recognize Jones in the photo as his shooter but lied when presented with the photo lineup because he did not want to get involved in the case.

On June 2, 2014, ATF arrested Barlow for selling crack cocaine.  Barlow agreed to cooperate with ATF's investigation of the shootings at his apartment complex on March 27, 2014, and April 2, 2014.  Barlow told Agent Labno that he had seen his shooter in the photo lineup that Taylor had presented to him and had paused on the

4

photo of his shooter.  Barlow then described his shooter to Labno as a light-skinned black man with a beard, which was consistent with Jones's appearance.  Labno then presented black-and-white photocopies of the same photo lineup that Taylor had shown Barlow in Oak Park, and Barlow identified Jones's photo as that of his shooter.

In overruling Jones's motion to suppress Barlow's identification, the trial judge concluded that the composition of the photo lineup was not unduly suggestive because it did not make Jones's photo stand out.  She explained that all six photos in the lineup were of black men who appeared to be roughly the same age and of similar build.  The men in the photos had different skin tones and at least five had some facial hair.  The judge added that because Oak Park police had compiled the photos in the lineup more than a month before Barlow accurately described his shooter to Labno as a light-skinned black man with a beard, Jones could not successfully claim that the lineup had been compiled based on that description.

## B.    Trial, conviction, and sentencing

On the eve of trial, Jones pled guilty to counts 1 through 7, which were largely based on his involvement in the drug-trafficking conspiracy.  He proceeded to a bench trial—simultaneous with Kelsey's jury trial—on the five remaining charges.  On January 29, 2016, the trial judge convicted Jones on counts 8 through 12.  Jones moved for a judgment of acquittal or a new trial, and on May 9, 2016, the judge denied the motion.  She sentenced Jones on May 18, 2016 to a forty-year prison term.

## C.    Appeal

Jones appealed to the Seventh Circuit, challenging his conviction on three grounds.  He first argued that the evidence was insufficient to support his conviction on

count 9 for violating 18 U.S.C. § 924(c) by possessing a firearm during the drugs-for-guns transaction on March 26, 2014. The court rejected this argument, concluding that there was sufficient evidence to support a finding that Jones constructively possessed a gun, through Fields, during the deal.

Second, Jones challenged the sufficiency of the evidence to support his convictions on counts 10, 11, and 12, which were all based on his shooting of Barlow. Jones argued that these convictions were based primarily on the testimony of Barlow, who he contended was an unreliable witness. The court rejected this argument, declining to "second-guess the trier of fact's credibility determinations." *Jones*, 872 F.3d at 489 n.1.

Third, Jones challenged the trial judge's denial of his motion to suppress Barlow's identification of him. He argued that the procedures used to present Barlow with the photos in the lineup were unduly suggestive. The court concluded that they were not.

The Seventh Circuit affirmed Jones's convictions on September 20, 2017. *Id.* at 495. Jones then filed a petition for writ of certiorari to the Supreme Court, which the Court denied on February 20, 2018. *Jones v. United States*, 138 S. Ct. 1023 (2018).

## D. Section 2255 motion

On November 8, 2018, Jones wrote to this district's Clerk, seeking records from his case that he said he needed to establish withholding of evidence by the government—the predicate for one or more of the contentions in the section 2255 motion that he ultimately filed. The request letter was postmarked November 9, 2018 and filed on the docket on November 14, 2018. No response came for twelve weeks. In a letter dated February 6, 2019, the Clerk informed Jones that his records "will be

mailed" to the warden of the prison at which he was held.  Def.'s Mot. for Extension of Time, 14 CR 155 (dkt. no. 479) at 5.

On February 14, 2019, six days before his deadline to file a motion under section 2255, Jones filed a motion seeking a ninety-day extension of time.  He explained that the prison was under lockdown starting January 24, 2019 and ending on or about February 14, 2019, so he had not been able to access typewriters or the library.  He also reported that due to the lockdown he had not received from the warden the materials he had requested from the Clerk.

The Court denied Jones's motion on February 25, 2019, ruling that the one-year limitations period set forth in section 2255(f) does not provide for any advance determination on the appropriateness of an otherwise late filing.  The Court noted that the statute of limitations is subject to equitable tolling and that it would determine whether application of that doctrine was warranted once Jones filed a section 2255 motion.

Jones filed his section 2255 motion on March 12, 2019, citing six separate grounds for relief from his sentence.  On August 5, 2019, Jones moved to amend his motion, and the Court granted the request.

## Discussion

Jones seeks relief under 28 U.S.C. § 2255, which allows a court to vacate, set aside, or correct a sentence imposed in violation of the laws of the United States or otherwise subject to collateral attack.  The Court will address Jones's March 12 motion first and his amended August 5 motion second.

A.    **March 12 motion**

Jones's March 12 motion under section 2255 includes several attacks on his bench trial convictions on counts 10, 11, and 12 of the indictment.  These counts were all based on the shooting of Barlow on March 27, 2014.  Count 10 was a charge for conspiracy to kill another person with intent to retaliate against a government informant, in violation of 18 U.S.C. § 1513(f).  Count 11 charged Jones with attempting to kill another with intent to retaliate against an informant, in violation of 18 U.S.C. § 1513(a)(1)(B).  Count 12 was a charge for discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c).

1.    **Statute of limitations**

A motion under section 2255 must be filed within one year of four dates listed in subsection (f).  The parties do not dispute that the limitations period for Jones's motion began to run on the date the judgment of his conviction became final, *see* 28 U.S.C. § 2255(f)(1), which was February 20, 2018, the date the Supreme Court denied his petition for a writ of certiorari.  *See Clay v. United States*, 537 U.S. 522, 527 (2003).  Nor do the parties dispute that Jones filed his section 2255 motion on March 12, 2019, after the limitations period ended on February 20, 2019.

Jones argues, however, that the statute of limitations should be equitably tolled because of the delays in receiving his records from the Clerk and the fact that the prison was under lockdown from January 24, 2019 through about February 14, 2019.  Jones contends that the lockdown prevented him from accessing the prison's library and typewriters to prepare his petition.  The government responds that even if these circumstances could excuse the late filing of a section 2255 motion, Jones is not entitled

8

to equitable tolling because of his delay making his request to the Clerk and preparing his motion prior to the lockdown.

"To qualify for equitable tolling, a [movant] must show: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Lombardo v. United States*, 860 F.3d 547, 551 (7th Cir. 2017). Although the "threshold necessary to trigger equitable tolling is very high," *id.*, the doctrine is "not 'a chimera'" that "exist[s] in name only," *Gray v. Zatecky*, 865 F.3d 909, 912, 913 (7th Cir. 2017) (quoting *Socha v. Boughton*, 763 F.3d 674, 684 (7th Cir. 2014) (*Socha II*)). "The realm of equitable tolling is a 'highly fact-dependent area' in which courts are expected to employ 'flexible standards on a case-by-case basis.'" *Socha II*, 763 F.3d at 684 (quoting *Socha v. Pollard*, 621 F.3d 667, 672 (7th Cir. 2010) (*Socha I*)).

Because a movant's diligence is "best evaluated in light of th[e] broader picture" of the conditions he faced, the equitable tolling analysis begins with the extraordinary circumstances element. *See id.*; *see also Mayberry v. Dittmann*, 904 F.3d 525, 530 (7th Cir. 2018). To satisfy this element, a movant must show that the conditions that prevented timely filing were "both extraordinary *and* beyond [his] control." *Lombardo*, 860 F.3d at 552 (quoting *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 756 (2016)). This requires a court to consider "the full picture with which the inmate [was] contending." *Socha II*, 763 F.3d at 685. A court "must evaluate the circumstances holistically, considering 'the entire hand that the [movant] was dealt' rather than taking each fact in isolation." *Gray*, 865 F.3d at 912 (quoting *Socha II*, 763 F.3d at 686). For example, the fact of incarceration does not, on its own, qualify as an

9

extraordinary circumstance, but it is a relevant consideration in determining whether circumstances beyond a movant's control prevented timely filing. *Socha II*, 763 F.3d at 685. The Seventh Circuit has recognized that several months' delay in receiving the papers necessary for preparing a motion may justify equitable tolling, as might a movant's limited access to a prison library. *See Gray*, 865 F.3d at 913; *Socha II*, 763 F.3d at 686; *see also Schmid v. McCauley*, 825 F.3d 348, 350 (7th Cir. 2016) ("inability to access vital papers" is "one potentially extenuating circumstance").

Jones has established that he encountered extraordinary circumstances beyond his control excusing his late filing. Despite Jones's request, in early November 2018, nearly three and one-half months before his filing deadline, for records from his case that he needed to prepare his motion, he got no response at all from the Clerk for almost three months. Then, he did not actually receive the documents he had requested until February 18, 2019, just two days before the filing deadline. The Seventh Circuit has noted that the length of time available to file after a movant receives his case records is "quite pertinent" to the determination of whether he encountered extraordinary circumstances: "several months will be one thing; two days quite another." *Gray*, 865 F.3d at 913. In *Gray*, the court rejected the state's argument that so long as a section 2254 movant received his case records within the limitations period, any filing delay was entirely his own responsibility. *Id.*[1]

Other facts likewise support the application of equitable tolling. Specifically,

---

[1] In *Gray*, the court ultimately concluded that equitable tolling was not warranted because, after the movant had received his state court records, he still had forty-three days with unobstructed access to the prison's legal resources to timely file his motion. *Id.* Here Jones had only two days.

Jones points to the roughly three-week prison lockdown that started on January 24, 2019, which left him without access to the prison's library or typewriters during this critical pre-filing period.  *See id.* (noting that limited library access is relevant to the extraordinary circumstances analysis); *Socha II*, 763 F.3d at 686.

The government acknowledges that lack of access to a prison library may be an extraordinary circumstance that justifies equitable tolling.  It contends, however, that application of the doctrine is not appropriate because Jones has not established the second requirement, diligence in pursuing his rights.  *See Lombardo*, 860 F.3d at 551. The government argues that Jones was not diligent because he waited until the last four weeks of the limitations period, when the lockdown limited his access to the library and typewriters, to begin preparing his motion.  But the record indicates otherwise:  Jones's request to the Clerk indicates that he began his efforts to prepare his motion at least as of early November 2018, well over three months before the statutory deadline.  This certainly reflects reasonable diligence; "maximum feasible diligence" is not required. *See Gray*, 865 F.3d at 912 (quoting *Holland v. Florida*, 560 U.S. 631, 653 (2010)).   The fact that Jones was able to file his motion on March 12, 2019—less than a month after the lockdown was lifted on February 14 and he received his records on February 18— indicates that he would have been able to file his motion in a timely fashion had these impediments not existed.   Once these barriers fell away, Jones filed his motion in very short order.  *Cf. Carpenter v. Douma*, 840 F.3d 867, 871 (7th Cir. 2016) (concluding section 2254 petitioner was not reasonably diligent where he filed a motion for a stay prior to the statutory deadline but did not file his petition until almost seven months after the deadline passed); *United States ex rel. Hernandez v. Yurkovich*, No. 11 C 6910,

2012 WL 4338822, at *7 (N.D. Ill. Sept. 19, 2012) (petitioner not diligent where he had waited over a year to file after discovering he had been defrauded by an organization that he had enlisted to prepare and file his habeas petition).

Other facts support a conclusion that Jones was reasonably diligent in pursuing his rights. When the prison lockdown lifted, Jones immediately alerted the Court via his motion to extend time—filed six days before his deadline—that the lockdown had interfered with his ability to timely prepare his motion. *See Socha II*, 763 F.3d at 688 (petitioner reasonably diligent where he alerted the court to anticipated late filing before the statutory deadline arrived and sought to preserve his rights). Jones's efforts therefore distinguish from those in the "typical" cases in which courts find a lack of diligence where "a tardy petitioner puts nothing before the court" and then requests equitable tolling. *See id.*

In support of its argument that Jones was not diligent, the government cites three cases. Its reliance on these cases is unavailing. In the first, *Jones v. Hulick*, 449 F.3d 784 (7th Cir. 2006), the Seventh Circuit broadly rejected a section 2254 petitioner's request for equitable tolling that was based, in part, on his limited access to the prison law library during the limitations period. *Id.* at 789. The court in *Jones* did not specifically analyze whether the petitioner had been reasonably diligent, and thus its reasoning does not preclude a finding that Jones was reasonably diligent, particularly given the Seventh Circuit's later pronouncement that "equitable tolling is a highly fact-dependent area in which courts are expected to employ flexible standards on a case-by-case basis." *Socha II*, 763 F.3d at 684. *Estremara v. United States*, 724 F.3d 773 (7th Cir. 2013), which the government also cites, is not instructive on the question of

reasonable diligence. The question of equitable tolling was not before the court in *Estremara*, as the defendant only invoked section 2255(f)(2) to argue that his request for collateral relief was timely. *Id.* at 777. Finally, the government cites *Hardaway v. Harrington*, No. 12 C 5431, 2013 WL 6069433 (N.D. Ill. Nov. 18, 2013), where a district court rejected a section 2254 petitioner's request for equitable tolling based on limited access to prison legal resources during the limitations period. *Id.* at *4-5. The petitioner in *Hardaway* filed almost ten years after his conviction became final, and the court concluded that he had not demonstrated that he had been diligently pursuing his rights. *Id.* In contrast to Jones's case, however, there is no indication in *Hardaway* that the petitioner took any action at all within the limitations period to pursue postconviction remedies.

In sum, the Court concludes that Jones has established that extraordinary circumstances beyond his control prevented his timely filling and that he was reasonably diligent in the face of these circumstances. He is therefore entitled to equitable tolling, and the government's request to dismiss his motion as untimely lacks merit. The Court therefore turns to the merits of the claims in Jones's March 12, 2019 section 2255 motion.

### 2. Ineffective assistance of trial counsel

Jones makes two claims that he was denied his Sixth Amendment right to effective assistance of counsel at trial. First, he contends trial counsel should have objected to the admission of Kelsey's post-arrest statement. Second, Jones argues trial counsel should have objected to the admission of the photo lineup identification based on the improper inclusion of Jones's photo in the array.

To succeed on a claim that his right to effective assistance of counsel was violated, Jones must show both deficient performance by counsel and prejudice. *Perrone v. United States*, 889 F.3d 898, 908 (7th Cir. 2018). To establish the deficient performance element, a movant must show that his attorney's performance "fell below an objective standard of reasonableness." *Kirklin v. United States*, 883 F.3d 993, 996 (7th Cir. 2018) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). In doing so, the movant must overcome a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Perrone*, 889 F.3d at 908 (quoting *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009)). To satisfy the prejudice element, a movant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kirklin*, 883 F.3d at 996.

### a. Kelsey's post-arrest statement

Jones argues that his trial counsel was ineffective because he failed to object to the admission of Kelsey's post-arrest confession to a drug-trafficking conspiracy with Jones. Federal Rule of Evidence 801(d)(2)(E) excludes from the definition of hearsay statements of a co-conspirator that are made during the course and in furtherance of a conspiracy. Jones correctly points out that Kelsey's post-arrest statement was not admissible against him under Rule 801(d)(2)(E), because it was not made during the course or in furtherance of the conspiracy—it was a post-arrest admission made to law enforcement. *See, e.g., United States v. Williams*, 272 F.3d 845, 860 (7th Cir. 2001).

The government argues that this statement was admitted only in Kelsey's simultaneous jury trial and not in Jones's simultaneous bench trial. This argument is not

14

supported by the record.  Prior to trial, the government moved to admit under Rule 801(d)(2)(E) Kelsey's post-arrest statement against Jones.  Mot. to Admit Evidence Pursuant to Fed. R. Evid. 801(d)(2)(E) (dkt. no. 189) at 1, 20-21.  *See United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978) (requiring a court to make a preliminary determination, prior to trial, regarding the admissibility of a co-conspirator's declaration).  The trial judge granted the government's motion "without objection." Order of Dec. 16, 2015 (dkt. no. 255).

Although it may well have been objectively unreasonable for trial counsel not to object to the admission of Kelsey's post-arrest statement against Jones, Jones cannot show a reasonable probability that the outcome of trial would have been different if not for this error.  *See Kirklin*, 883 F.3d at 996.  Jones argues that without Kelsey's post-arrest statement, the evidence was insufficient to show his intent to retaliate against the CI, as required for convictions on counts 10, 11, and 12.  But there is no indication that the trial judge relied at all on Kelsey's post-arrest statement in convicting Jones on counts 10, 11, and 12 or in denying his motion for a judgment of acquittal.  The judge made no mention of Kelsey's statement and instead cited to the other ample evidence of Jones's motive to retaliate, such as evidence that the CI had introduced him to Agent Labno and helped arrange the drugs-for-guns deal.  The judge also pointed to phone records showing Jones's repeated attempts to contact the CI after the deal was disrupted by Fields's arrest and frequent calls between Jones and Kelsey between March 26, when Fields was arrested, and April 2, when Kelsey shot the CI.

Because Jones cannot show prejudice based on his lawyer's failure to object to the admission of Kelsey's post-arrest statement, his ineffective assistance claim cannot

succeed.

  **b. Photo lineup**

  Jones also contends he was denied effective assistance of counsel at trial because his defense attorney failed to object to the inclusion of his photo in the lineup presented to Barlow. Jones contends that counsel should have moved to exclude Barlow's identification because he did not match Barlow's descriptions of the shooter to Oak Park police: on March 27 and March 28, 2014, Barlow described the shooter as a clean-shaven man. Jones argues that Taylor improperly included his photo, which showed him with a full beard, because ATF had already flagged him as a suspect in the shooting of Barlow.

  To exclude identification evidence, a defendant must show that the procedure used by law enforcement was "both suggestive and unnecessary." *See Jones*, 872 F.3d at 490 (quoting *Perry*, 565 U.S. at 239). Jones's counsel moved to suppress the identification by Barlow, arguing that the photo array was suggestive for two reasons. First, he argued that Jones's photo stood out in the array because it was the only one featuring a light-skinned black man with facial hair. Second, counsel argued that the lineup was suggestive because it was compiled based on Barlow's description of his shooter to ATF as a light-skinned black man with a beard. The trial judge rejected both arguments and overruled the motion to suppress. After examining the six photos used in the lineup, the judge concluded that the composition of the array was not unduly suggestive. She observed that the persons featured in the photos were all black men with different skin tones; five of the six men had some facial hair; and all of them appeared to be of similar age and physical build. Thus, the judge found, Jones's photo

16

did not stand out.  The judge also ruled that the photo array could not have been created based on Barlow's description of his shooter to ATF, because Oak Park police had compiled the lineup weeks before Barlow described his shooter to ATF.

Jones has not shown that his defense counsel's performance in challenging the identification fell below an objective standard of reasonableness due to counsel's failure to argue that Jones's photo should not have been included in the lineup.  *See Kirklin*, 883 F.3d at 996.  The argument that Jones contends his counsel omitted does not address the suggestiveness of the lineup—the proper focus of a successful identification challenge, and what his counsel attacked.  Rather, it focuses more directly on the accuracy of Barlow's identification, which largely concerns the weight to be given to it, not whether it should have been excluded.  Jones offers no authority to support the proposition that counsel did anything other than make a reasonable strategy choice in seeking to exclude the identification.

Even if Jones could show that the failure to object to the inclusion of his photo in the lineup was deficient performance by counsel, he has failed to establish the prejudice element of this claim.  *See Perrone*, 889 F.3d at 908.  As already discussed, the trial judge concluded that the composition of the photo array was not suggestive, and she specifically found that it did not make Jones's photo stand out.  Under the circumstances, Jones cannot show a reasonable probability that the result of the motion to exclude would have been different had counsel objected to the inclusion of his photo.  *See Kirklin*, 883 F.3d at 996.

### 3.    *Brady* violation

Jones's next claim is based on his contention that the government improperly

withheld exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), relating to Kelsey's post-arrest statement. Specifically, Jones contends that the government failed to turn over medical records showing that when Kelsey made his statements admitting to the drug-trafficking conspiracy, he was experiencing drug withdrawal and therefore his confession was not voluntary. Jones argues that without Kelsey's post-arrest statement, the evidence was insufficient to establish Jones's motive to retaliate for counts 10, 11, and 12.

Jones's argument lacks merit. To succeed on his claim, Jones "bears the burden of proving that the evidence is (1) favorable, (2) suppressed, and (3) material to the defense." *United States v. Walter*, 870 F.3d 622, 629 (7th Cir. 2017) (quoting *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014)). Evidence is material if "there is a reasonable probability, that had it been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). Jones has not shown that the evidence undermining the reliability of Kelsey's confession was material to his defense, because the record does not reflect that the trial judge relied to any extent on Kelsey's confession when she convicted Jones on counts 10, 11, and 12. As explained earlier, the trial judge made no mention of Kelsey's confession at all in ruling at the conclusion of Jones's bench trial or in denying his motion for judgment of acquittal. Instead, the judge relied on other evidence, such as Jones's relationship to the CI and phone records, to find that the government had proven his motive to retaliate.

For this reason, Jones's *Brady* claim regarding Kelsey's medical records lacks merit.

### 4. Sufficiency of evidence on motive to retaliate

Jones next argues that trial court erred in admitting, under Federal Rule of Evidence 404(b)(2), the evidence of the drug-trafficking conspiracy to show his motive to retaliate against the CI. Additionally, he argues that this evidence was insufficient to establish his motive to retaliate for the purposes of counts 10, 11, and 12.

The government argues that Jones is procedurally barred from making these arguments because he did not raise them on direct appeal. The Court agrees. "A § 2255 petition is 'not a substitute for a direct appeal.'" *United States v. Fleming*, 676 F.3d 621, 625 (7th Cir. 2012) (quoting *Coleman v. United States*, 318 F.3d 754, 760 (7th Cir.2003)). A claim that was not raised on direct appeal cannot be raised for the first time in a section 2255 motion, unless the movant can show cause and prejudice or that he is actually innocent. *See Delatorre v. United States*, 847 F.3d 837, 843 (7th Cir. 2017). Jones does not argue the latter exception. Nor has he made any argument as to cause that would excuse his failure to challenge, in his direct appeal, the admission of the drug-trafficking evidence or the sufficiency of the evidence to establish his intent to retaliate. The Court concludes that this claim is defaulted.

### 5. Ineffective assistance of appellate counsel

Next, Jones argues that he was denied effective assistance of counsel on his direct appeal because his appellate counsel failed to challenge the sufficiency of the evidence on count 10, the charge of conspiracy to kill with intent to retaliate. Specifically, Jones argues that his appellate counsel was ineffective for failing to challenge the credibility of Smith, who testified about his March 30, 2014 meeting with Jones and Kelsey. Jones contends that he was prejudiced by this because Smith's

19

testimony was the only evidence of an agreement between Jones and Kelsey to retaliate against the CI.

The same standard that governs claims for ineffective assistance of trial counsel governs claims challenging the performance of appellate counsel. *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). Thus to succeed on this claim, Jones must show both deficient performance and prejudice. *See id.* "Appellate counsel is not required to present every non-frivolous claim on behalf of her client." *Id.* To demonstrate deficient performance, Jones must show that the argument counsel failed to make was both "obvious" and "clearly stronger" than the issues he did raise on appeal. *Id.* at 898 (quoting *Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010)). Making this showing is "generally difficult" because "the comparative strength of two claims is usually debatable." *Id.* (quoting *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir.2013)).

Jones has not demonstrated deficient performance by appellate counsel. His attorney did challenge the sufficiency of the evidence to support his conviction on count 10. Instead of challenging the reliability of Smith's testimony, however, Jones's appellate counsel challenged Barlow's reliability. The Seventh Circuit rejected this argument, declining to "second-guess the trier of fact's credibility determinations." *Jones*, 872 F.3d at 489 n.1. Jones has not shown that challenging Smith's credibility instead of Barlow's would have been a "clearly stronger" claim, *see Makiel*, 782 F.3d at 898, particularly given that appellate courts typically will not reassess credibility determinations on appeal, *United States v. Harris*, 791 F.3d 772, 779 (7th Cir. 2015). The claim therefore lacks merit.

### 6.    Relief under the First Step Act

Jones has also moved for reduction of his sentence under the First Step Act of 2018, which modified some of the sentencing requirements for multiple violations of 18 U.S.C. 924(c) and expanded the role of courts in sentence modification.  *See* First Step Act of 2018, Pub. L. No. 115-391, §§ 403, 603(b), 132 Stat. 5194, 5221-22, 5239 (2018).

Jones was convicted on counts 9 and 12, both of which alleged violations of 18 U.S.C. § 924(c), which prohibits use of a firearm during a crime of violence.  At the time Jones was convicted and sentenced in 2016, the sentence for second or subsequent violations of section 924(c)—even if they arose in the same proceeding as the first violation—had to be imposed consecutively, or "stacked."  *See* 18 U.S.C. § 924(c)(1)(C) (2017).  Section 403 of the First Step Act modified this provision so that stacking applies only if a defendant's conviction for a first violation of section 924(c) was already final at the time of the second conviction.  *See* 18 U.S.C. § 924(c)(1)(C) (2019); First Step Act § 403(a), 132 Stat. at 5221-22; *see also United States v. Wade*, No. 99 CR 257, 2020 WL 1864906, at *3 (C.D. Cal. Apr. 13, 2020) (explaining sentencing under 18 U.S.C. § 924(c) before and after the First Step Act amendments).  Thus, if Jones were convicted for counts 9 and 12 today, his sentences for those two section 924(c) violations would not need to run consecutively.

The government argues that Jones's motion should be construed as a request for relief under 18 U.S.C. § 3582(c)(1)(B), which allows a court to modify a sentence "to the extent . . . expressly permitted by statute."  *Id.*  The government contends that the First Step Act does not expressly permit the Court to modify Jones's sentence, because

section 403 does not have retroactive application: it provides that the stacking requirement modification applies to "offense[s] . . . committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment."  First Step Act § 403(b), 132 Stat. at 5222.  The Act was enacted on December 21, 2018, and Jones was convicted and sentenced in 2016.  Thus, he does not qualify for modification of his sentence through the direct application of the amendments to 18 U.S.C. § 924(c).

But section 403 is not the only provision of the First Step Act under which the Court may modify Jones's sentence.  Section 603(b) of the Act amended 18 U.S.C. § 3582(c)(1)(A) to permit a court to modify a sentence upon a direct motion by the defendant.  132 Stat. at 5239.  Prior to this amendment, a defendant had to petition the Director of the Bureau of Prisons for a sentence reduction, and the Director could, at his discretion, file a motion for such a reduction.  *See* U.S.S.G. § 1B1.13, cmt. n.4 (2018).  As amended, 18 U.S.C. § 3582(c)(1)(A) provides that a defendant can move for modification of a sentence for "extraordinary and compelling reasons."  Since the enactment of the First Step Act, many district courts across the country have concluded that the sentencing disparities caused by the amendments to section 924(c) can amount to an extraordinary and compelling reason to modify a sentence.  *See, e.g.*, *United States v. Brown*, No. 05 CR 227, 2020 WL 2091802, at *8 (S.D. Iowa Apr. 29, 2020) (listing cases); *United States v. Marks*, No. 03 CR 6033L, 2020 WL 1908911, at *16-17 (W.D.N.Y. Apr. 20, 2020); *Wade*, 2020 WL 1864906, at *5.

The Court must nonetheless deny Jones's motion for modification of his sentence under the First Step Act, because he has not satisfied a statutory prerequisite to

22

seeking relief in court under section 3582(c)(1)(A).  The statute permits a defendant to move for modification of his sentence only after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or there has been a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A).  There is nothing in the record suggesting that Jones has submitted a request to the Bureau of Prisons for modification his sentence, and he has offered no argument for excusing the statutory prerequisite.

For this reason, the Court denies, without prejudice, Jones's motion under the First Step Act for modification of his sentence.  He may refile the motion, if he wishes, upon satisfying the statutory prerequisite to presentment of the motion to a court.

**B.      August 5, 2019 amended motion**

In his amended section 2255 motion, filed on August 5, 2019, Jones has asserted three additional grounds for relief.  This first is an additional *Brady* claim. Jones alleges that, prior to the suppression hearing, the government failed to disclose certain records related to the photo lineup compiled by Detective Taylor.  The second is a claim of ineffective assistance of trial counsel based on counsel's failure to object to hearsay testimony during grand jury proceedings and to adequately cross-examine Barlow during the suppression hearing.  The third claim is an alleged due process violation based on prosecutorial delay in commencing grand jury proceedings.

The government argues that all three of the claims raised in the amended motion are time-barred.  The Court agrees. The amended motion was filed on August 5, 2019, several months after the limitations period closed on February 20, 2019.  The claims in

the amended motion may be deemed timely only if they "relate back" to the claims raised in the March 12 motion, which the Court has deemed timely through the application of equitable tolling. *See Beason v. Marske*, 926 F.3d 932, 938 (7th Cir. 2019). New claims do not relate back simply because they are based on "the same trial, conviction, or sentence as a timely filed claim"—instead, the new and original claims must share a "common core of operative facts." *Id.* (quoting *Mayle v. Felix*, 545 U.S. 644, 662, 664 (2005)).

The three new claims raised in Jones's August 5 amended motion do not share a common core of operative facts with any of the claims in his original March 12 motion. First, Jones's original claim based on the photo lineup focused on his trial counsel's conduct, specifically counsel's failure to object to the inclusion of Jones's photo. His new claim regarding the photo lineup focuses on the government's conduct, challenging its alleged failure to turn over *Brady* material relating to the lineup. Second, Jones's new ineffective assistance claim involves trial counsel's performance during the grand jury proceedings and the suppression hearing, but his original claim challenged trial counsel's failures to object to admission of Kelsey's post-arrest statement and Barlow's identification of Jones as his shooter. Finally, Jones's third new claim challenges the timing of the commencement of the grand jury proceedings, which has no relationship to any of the claims he asserted in his original motion.

For these reasons, none of the claims in Jones's August 5, 2019 motion relate back to the filing of the original motion. As a result, all of the claims are time-barred.

## Conclusion

For the foregoing reasons, the Court denies Jones's motion to vacate, set aside,

or correct his sentence under 28 U.S.C. § 2255 [dkt. no. 1]. The Court declines to issue a certificate of appealability because there is nothing in the record to suggest that its denials on the merits of Jones's March 12 claims are debatable, capable of different resolution, or deserving of further consideration. *See* 28 U.S.C. § 2253(c)(2); *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997). And because the denial on procedural grounds of Jones's August 5 motion is not fairly debatable either, the Court declines to issue a certificate of appealability on Jones's amended motion. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

_____

MATTHEW F. KENNELLY
United States District Judge

Date: May 18, 2020

25